IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TERESA J. HARRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No. 15-cv-829-CJP**[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Teresa J. Harris seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in February 2012, alleging disability beginning on June 30, 2010 (Tr. 11).   After holding an evidentiary hearing, ALJ Carla Suffi denied the application in a written decision dated January 29, 2014.   (Tr. 11-24). The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 1).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issue Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 8.

Plaintiff raises the following point:

1.      The ALJ erred in weighing the medical opinions.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

>The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245

F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Harris was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920,

921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Suffi followed the five-step analytical framework described above.   She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   She found that plaintiff had severe impairments of obesity, cervical degenerative disc disease status post fusion surgery, bilateral carpal tunnel syndrome, right ulnar neuropathy, degenerative tear in right wrist, osteoarthritis and lateral epicondylitis in right elbow, osteoarthritis of the right shoulder, depression, panic disorder and PTSD.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Harris had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.   Agency Forms

Plaintiff was born in 1962, and was 47 years old on the alleged onset date of

June 30, 2010.   She was insured for DIB through December 31, 2014.[3]   (Tr. 164).

She had worked as a histotechnologist at a VA hospital from 1983 through 2011.[4]

(T. 167).   Plaintiff described her job duties as "I processed, embedded, cut and

stained human tissue samples.   I assisted with autopsies and other medical

procedures that required lifting of the bodies.   I performed preventative

maintenance."   (Tr. 192).

Plaintiff submitted a Function Report in March 2012 in which she stated that

she took medications three times a day, used a TENS unit four times a day, used a

bone growth stimulator once a day, used ice on her neck and arms, did prescribed

occupational therapy and went to doctor appointments.   She stated that she

watched TV and sometimes when to the store, pharmacy or post office with her

mother.   (Tr. 202).   She did no household chores.   Her mother did the

housework and her brother did the yardwork.   (Tr. 203).   She said she could not

work because she was depressed and in pain.   (Tr. 204).

In June 2012, plaintiff reported that her depression and anxiety were much

worse.   (Tr. 233).   She was taking Prozac and Xanax.   She said that she stayed in

bed most of the time and that "my employer is destroying me physically and

mentally and financially with constant threats."   (Tr. 236-237).   In August 2012,

she reported that she did not get out of bed often.   (Tr. 242).   She had been

terminated from her job in June 2012.   (Tr. 245).   She said she "blew the

---

[3] The date last insured is relevant only to the claim for DIB.

[4] "A histotechnologist is someone that is part of a medical laboratory team that works with human, animal or plant specimens to diagnosis disease and abnormalities. Their main function is to prepare tissue samples for analysis." https://www.sokanu.com/careers/histotechnologist/, visited on August 15, 2016.

whistle" on the VA Medical Center, her former employer, and she was terrified that she would be "destroyed by them."   (Tr. 247).   Her primary care doctor was sending her to mental health provider.   (Tr. 249).

**2.     Evidentiary Hearing**

Ms. Harris was represented by an attorney at the evidentiary hearing on December 16, 2013.   (Tr. 32).

Plaintiff was 51 years old.   She was 5'6" and weighed 200 pounds.   She lived alone, but her mother and brother lived next door.   (Tr. 35).   She began working at the VA medical center as a histologist in 1983.   She was put on elevator duty in the summer of 2009 because she had work restrictions related to her arm. On elevator duty, she sat in an elevator and told the public that the elevator was not in use.   It was only to be used by surgery patients.   She stopped working in September 2009, and received workers' compensation benefits until she briefly returned to work in June 2012.   She was terminated in 2012, but that was reversed and she resigned due to medical inability to do her job.   She began receiving federal disability retirement benefits in October 2013.   (Tr. 36-38).

Plaintiff originally had pain in her right arm, which was diagnosed as lateral epicondylitis.   After physical therapy, a tendon ruptured.   She still had pain in the right arm at the time of the hearing.   She also had a neck fusion, but still had pain and limited motion because she had a herniated disc above the fusion.   She had migraine headaches.   Her headaches had been helped by nerve blocks and increased dosage of Amitriptyline.   She took large doses of Ibuprofen to keep the swelling down in her right arm.   (Tr. 39-41).

Plaintiff first sought mental health treatment after the onset of disability in September 2012.   She saw Dr. Clark, whom she had seen in the past for issues related to her family and to her work.   She saw Dr. Clark every week.   She did not go to Dr. Clark until September 2012 because her primary care physician was prescribing medicine for her mental condition.   Her PTSD was related to being humiliated in the elevator and to working on autopsies of patients who had died because of medical negligence.   She had problems leaving home.   During her four year effort to get comp benefits, she believed that people from the VA were driving past her house.   (Tr. 41-44).   She and Dr. Clark have primarily working on getting her to go out of the house.   (Tr. 53).

Since her neck surgery, she could not feel her ring finger or little finger on her right hand.   (Tr. 46).

Plaintiff's mother does her housework and brings her food.   Her brother does her yardwork.   If she goes grocery shopping, she goes after midnight so she will not see anyone she knows.   Dr. Clark's notes say she acted as a caregiver for family members, but all she did was sit and listen to her mother and sister.   (Tr. 46-47).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level, limited to only occasional stooping, crouching, and crawling; no climbing of ladders, ropes or scaffolds; occasional overhead reaching with right upper extremity; frequent overhead reaching with the left upper extremity; frequent feeling

8

with both upper extremities; no work in temperature extremes or in loud noise environments; and no fast production pace work, only goal oriented work.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do.   Examples of such jobs are office helper, routing clerk, and checker.   If, in addition to the other limitations already listed, she were also limited to lifting only five pounds with the right arm, there would be no jobs that she could do.   (Tr. 55-57).

### 3.   Medical Treatment

Plaintiff was treated for her elbow pain by Dr. Scott Karr.   In January 2010, Dr. Karr noted that she had been previously diagnosed with lateral epicondylitis.[5] She had been treated with injections, physical therapy and anti-inflammatory medication.   In December 2009, she felt a strong pop in her elbow while getting up out of a chair.   On exam, she had pain and tenderness in the elbow and on motion. The impression was partial or complete tear of a tendon.   Dr. Karr prescribed physical therapy to regain range of motion and prescribed Ibuprofen 600 mg. in place of the anti-inflammatory.   (Tr. 340).

On June 23, 2010, Dr. Karr noted that plaintiff had been back to work full time without restrictions per a recommendation from the Indiana Hand Center.[6] On exam, she had some pain on motion of the right elbow and held her elbow very stiffly.   The impression was stable right elbow lateral epicondylitis.   Dr. Karr agreed that she could return to work full time without restrictions.   (Tr. 344).

---

[5] "Tennis elbow (lateral epicondylitis) is a painful condition that occurs when tendons in your elbow are overloaded, usually by repetitive motions of the wrist and arm."   http://www.mayoclinic.org /diseases-conditions/tennis-elbow/home/ovc-20206011, visited on August 17, 2016.
[6] There are no records from the Indiana Hand Center in the file.

Plaintiff alleges that she became disabled as of June 30, 2010.

She returned to Dr. Karr on July 7, 2010, with complaints of pain in the right elbow, wrist and shoulder.   On exam, she had pain in all three areas with motion. She held her elbow very stiffly and did not want to move her elbow or shoulder. The etiology of her symptoms was unclear.   He said that she could work without restrictions.   (Tr. 345).

Plaintiff's primary care physician was Dr. Mohammad Azam.   She saw him, or another provider in his group, periodically.   She was treated for diabetes, hyperlipidemia, and pain in her right elbow, wrist, and neck, as well as depression and anxiety.   Among other medications, she was prescribed Prozac, Elavil and Xanax.   Generally, in the review of systems section of the office notes, she denied depression or psychiatric symptoms.   (Tr. 664-770).   In November 2010, Dr. Azam noted that she was being seen by specialists for her orthopedic issues, and that he would not treat her for those problems.   (Tr. 747).

In December 2010, Dr. Karr noted that Ms. Harris had been evaluated by a number of specialists, and they agreed that "there is no significant pathology in her elbow to warrant the amount of symptoms that she has, especially to warrant being off from work."   His impression was right elbow and wrist pain of unclear etiology. He noted that Dr. Fonn was evaluating her for cervical spine problems.   (Tr. 346).

Ms. Harris was evaluated by Dr. Sonjay Fonn on November 24, 2010.   She reported neck pain radiating down her right arm, headaches, neck spasm, and numbness and weakness of the right arm.   (Tr. 470-474).

A nerve conduction study done in December 2010 showed mild bilateral

10

carpal tunnel syndrome involving sensory fibers only, mild right ulnar neuropathy at the elbow, and no evidence of cervical radiculopathy on either side. (Tr. 483-484).

In January 2011, Dr. Fonn noted that an MRI of the cervical spine showed indentation and flattening of the thecal sac and the spinal cord at C5-6 and C6-7 which "was central and would not typically cause a radiculopathy." However, it was dangerous due to the risk of paralysis. He recommended a course of epidural injections. She had injections in February and March 2011. She cancelled the third injection and told Dr. Fonn that she would like to proceed with surgery because the injections gave her poor relief. (Tr. 460-467).

Dr. Karr continued to see plaintiff periodically and to note right elbow and wrist pain of unclear etiology. (Tr. 348-352). In July 2011, he noted that there was no MRI evidence of lateral epicondylitis in the right elbow and she possibly had a degenerative tear of the triangular fibrocartilage of the right wrist. He gave her a five pound lifting restriction. (Tr. 352).

In August 2011, Dr. Fonn noted that they were waiting for workers' comp to authorize the surgery. Ms. Harris asked him to amend his initial history and physical note. She emailed the information that she wanted to be included in the note. The amendment stated that, when she returned to work from June 21, 2010, to June 30, 2010, she did "a massive amount of work on the computer and took continuing education examinations in excess of 50 hours." She further indicated that her cervical spine condition was "aggravated by all of this work and showed itself on 6/25/2010 for the first time." (Tr. 450).

11

In October 2011, an MRI of the cervical spine showed severe disc and osteophyte complex and central disc herniation at C5-6, with suggested impingement, as well as less severe narrowing at C6-7.   (Tr. 481). On December 19, 2011, Dr. Sonjay Fonn performed discectomy, fusion and stabilization surgery at C5-6 and C6-7.   (Tr. 488-491).

A postoperative cervical MRI done in March 2012 showed normal alignment. The cervical discs were unremarkable in position without evidence of stenosis. There was some degenerative change at C5-6 resulting in foraminal narrowing. (Tr. 475).

The last visit with Dr. Karr was on March 21, 2012.   Plaintiff said her elbow had been doing better, but she had a setback about ten days earlier when she felt a "pop."   It had improved since then, but she was not back to baseline.   On exam, he found swelling and tenderness to palpation over the lateral epicondyle.   Tinel's was negative at the elbow.   She had active wrist extension and flexion.   Sensation was grossly intact throughout her hand in all dermatomes.   His impression was chronic right lateral epicondylitis.   She was to continue physical therapy three times a week and to return to the doctor as needed.   (Tr. 357).   On that same date, Dr. Karr filled out a Patient Status Report indicating that Ms. Harris had a lifting restriction of five pounds.   (Tr. 544-545).

On March 28, 2012, Dr. Fonn noted that Ms. Harris was "doing very well with continued good resolution of pre-operative symptoms."   (Tr. 441).

James Peterson, Ph.D., performed a consultative psychological exam on April 18, 2012.   Ms. Harris told him that she had PTSD from conflicts at work and

that she was depressed.    She was not seeing a mental health specialist, but was taking BuSpar (an anti-anxiety drug) prescribed by her regular doctor.   She said that she had minimal activities and that she "lies on the couch all day."   Her mother and brother provided her care and did most of her chores.   On exam, she was despondent with intermittent tears when discussing the VA, but she responded in context and was cooperative and oriented.   He diagnosed PTSD, chronic.   (Tr. 577-580).

In June 2012, Dr. Azam saw her for management of her ongoing conditions of diabetes, hyperlipidemia, and depression.   He noted that her depression began about five years earlier and her symptoms were fairly controlled with medication. She was not feeling down anymore, had no side effects from medication and had lots of energy.   She was taking BuSpar, Prozac and Xanax.   On exam, she had normal insight and judgment and demonstrated an appropriate mood and affect. On the review of systems, she denied depression and psychiatric symptoms.   She had no sensory loss.   Dr. Azam concluded that her depression was stable with medication, but he suggested that she was on more medication than she needed and he wanted her to reduce her medication or to see a psychiatrist for future management.   (Tr. 610-614).

Ms. Harris was seen by Dr. Robert Gardner for headaches in May 2012.   On exam, sensation was intact and she had normal strength in the arms and legs. Fine finger movements were normal.   He recommended that she increase her dosage of Amitriptyline and undergo occipital nerve blocks.   (Tr. 618-621).

Dr. Gardner also ordered a nerve conduction study.   This showed moderate

right ulnar neuropathy localized to the elbow, mild chronic right C5 radiculopathy, mild chronic left C6 neuropathy, and mild left carpal tunnel syndrome. (Tr. 622-623).

Ms. Harris returned to Dr. Fonn in February 2013 complaining of continued pain and muscle spasm in her neck and decreased sensation in her right arm. X-rays showed anterior fusion and stabilization at C5-6 and C6-7 with good solid fusion seen.   There was no acute migration, subluxation or fracture.   He recommended a new MRI.   (Tr. 778).   In March 2013 she reported that she had not had the MRI due to insurance reasons.   She asked for narcotic medications, but Dr. Fonn said there was no diagnosis that would permit him to prescribe same. (Tr. 777).

In February 2013, plaintiff reported to Dr. Gardner that the occipital nerve block had relieved her headaches until last October.   She had lost her insurance, but wanted to have another nerve block when she got insurance again.   (Tr. 775).

In February 2013, Dr. Azam noted that plaintiff exhibited appropriate affect and mood, and had normal insight and judgment.   (Tr. 810).   In August 2013, plaintiff began seeing another doctor in Dr. Azam's group, Dr. Gretel Ruiz-Jorge. She denied feeling depressed.   She was seeing a counselor, Cindy Clark, which helped her to manage stress.   She also denied weakness and numbness in her extremities.   Musculoskeletal exam was negative for joint pain and joint swelling. (Tr. 803-806).

Ms. Harris began seeing Cynthia Clark, Ph.D., for counselling on September 9, 2012.   There are no notes documenting the sessions.   Dr. Clark wrote a

14

summary on September 19, 2012, stating that she had seen plaintiff from 1999 through 2005 for symptoms of stress, anxiety and depressed mood that were precipitated by her divorce and custody dispute.   She began seeing plaintiff for outpatient psychotherapy on September 9, 2012, "to address issues pertaining to problems with her employment at the VA Medical Center."   Dr. Clark wrote that she had symptoms consistent with panic disorder, agoraphobia and depression. (Tr. 773).

Dr. Clark submitted a form "Psychiatric Report" dated October 3, 2012. She indicated that eye contact, clothing, hygiene and motor activity were all normal or appropriate.   Her mood was depressed and she had a restricted range of affect. Her speech was relevant and coherent, thought process was logical and coherent, and she had no delusions or preoccupations.   She was oriented.   Dr. Clark indicated that, although cognitive functioning was intact, she suffered from depression and had problems with concentration and motivation.   Agoraphobia prevented her from going out during the day unless absolutely necessary.   She was unable to respond appropriately to customary work pressures due to depression and anxiety.   (Tr. 660-664).

On February 19, 2013, Dr. Clark prepared a short statement indicating that Ms. Harris had an Axis I diagnosis of panic disorder with agoraphobia and that she was "unable to work for an indefinite period of time."   (Tr. 774).   On September 23, 2013, Dr. Clark wrote a statement indicating that Ms. Harris had psychotherapy on a weekly basis to address issues related to her employment, issues related to the stress of unemployment and to applying for disability, and that

"she has focused on her role as a caregiver for several family members who have health problems."   (Tr. 772).   Dr. Clark prepared a "revised diagnosis" on November 25, 2013, adding a diagnosis of PTSD.   She indicated that Ms. Harris said that she had significant anxiety whenever she left her house, she limited her outings, and only went grocery shopping after midnight to avoid seeing anyone that she knew.   She set forth a narrative functional capacity assessment indicating that Ms. Harris had limited ability to focus on and attend to tasks in a work environment and triggering stimuli such as cell phones and crowds would keep her in a constant state of high anxiety.   (Tr. 817-818).

### 4.   State agency consultants' opinions

In May 2012, a state agency psychological consultant indicated that Ms. Harris had no severe mental impairment.   (Tr. 581-593).

In that same month, a state agency medical consultant indicated that Ms. Harris could do a reduced range of light work, limited to occasional overhead reaching with the right arm and frequent overhead reaching with the left.   (Tr. 595-602).   A second state agency consultant reviewed the evidence as of September 2012, including Dr. Karr's notes, and affirmed the previous opinion.   (Tr. 650-652).

<u>**Analysis**</u>

Plaintiff's sole point is that the ALJ erred in weighing the medical opinions in that she gave too little weight to the opinions of Drs. Karr and Clark, and too much weight to the opinions of nonexamining state agency consultants.

ALJ Suffi rejected Dr. Karr's opinion that Ms. Harris was limited to lifting

16

only five pounds because "the claimant's restrictions appear to be based on her subjective complaints as Dr. Karr has consistently noted there was no reasonable basis for the claimant's complaints." (Tr. 23). She rejected Dr. Clark's opinion because her records did not contain treatment notes or mental status examinations.

Drs. Karr and Clark are, of course, both treating doctors. The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." The applicable regulation, 20 C.F.R. §404.1527(c)(2) provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Obviously, the ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he or she may "bend over backwards" to help a patient obtain benefits.   *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).   See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds that the ALJ erred in rejecting Dr. Karr's opinion that Ms. Harris is limited to lifting five pounds.   She felt that he took inconsistent positions in that he originally returned her to work with no restrictions, but later imposed a five pound weight restriction beginning in July 2011.   (Tr. 22).   This reasoning is suspect.   Dr. Karr was not inconsistent in imposing the restriction.   On the contrary, from July 27, 2011, until the last visit in March 2012, he consistently stated that Ms. Harris was restricted from lifting more than five pounds.   The ALJ also said that "Dr. Karr has consistently noted there was no reasonable basis for the claimant's complaints."   This is a

mischaracterization of Dr. Karr's notes.   Dr. Karr initially diagnosed lateral epicondylitis, later accompanied by partial or complete tendon rupture.   (Tr. 340). In June 2010, he said she could return to work without restrictions.   (Tr. 344). However, after working for a short time, she returned with activity-related pain improved with rest.   (Tr. 345).   Dr. Karr did state that her pain was of unclear etiology and that she had negative MRI of the elbow and wrist.   See, Tr. 345, 348, 349, 351.   In July 2011, he suggested her problem might be a degenerative tear of the triangular fibrocartilage of the wrist.   (Tr. 351, 354).   In November 2011, he noted that x-rays showed that she had chronic changes at the lateral epicondyle consistent with lateral epicondylitis and recommended physical therapy and nonsteroidal anti-inflammatory medication.   (Tr. 355).   At the last visit, Dr. Karr again diagnosed chronic lateral epicondylitis.   (Tr. 357).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion.   *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).   While she is not required to mention every piece of evidence, "[s]he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."   *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ mischaracterized Dr. Karr's statements.   He did not state that there was "no reasonable basis" for plaintiff's complaints.   It is true that he said her pain was of uncertain etiology on several visits, but that is not the same as saying that there was no reasonable basis for her complaints.   And, the ALJ ignored the fact that, in the last two visits, Dr. Karr returned to his original diagnosis, lateral

19

epicondylitis, supported by x-ray findings.

The Commissioner stresses the fact that Dr. Karr stated several times that Ms. Harris' pain was of unclear etiology.   Etiology is defined as "the cause of a disease or abnormal condition."   http://www.merriam-webster.com/dictionary /etiology, visited on August 23, 2016.   A statement that the cause of a patient's pain is unclear is not the same as saying that the patient is exaggerating her pain, which is the implication of the ALJ's decision and of the Commissioner's argument.   It is true that Dr. Karr noted that various diagnostic studies were negative and he searched for an explanation for plaintiff's pain.   He did not, however, state that he suspected that she was exaggerating or malingering, and the ALJ's implied conclusion to the contrary is a mischaracterization of his records.

Plaintiff's argument as to Dr. Clark's opinion does not fare so well.

Dr. Clark indicated that she saw plaintiff for weekly psychotherapy sessions beginning on September 9, 2012.   However, as the ALJ noted, treatment notes documenting the weekly sessions were not made part of the record.   There were some notes reflecting a mental status examination, but those notes were contained in Dr. Clark's "Psychiatric Report" dated October 3, 2012, and not in a treatment note.   This void in the record left the ALJ unable to assess whether Dr. Clark's opinions were well-supported and consistent.   Plaintiff suggests that the treatment notes were not necessary because there is no basis to conclude that the ALJ was qualified to interpret such notes.   Doc. 19, p. 17.   This is tantamount to a suggestion that the ALJ was required to unquestioningly accept Dr. Clark's bottom line, which is, of course, incorrect.

20

Plaintiff also suggests that, if the ALJ felt she needed the treatment notes, she should have obtained them herself or informed plaintiff that the notes were needed. Doc. 19, pp. 16-17.   However, plaintiff had the responsibility to provide medical evidence showing that she has an impairment and the severity of that impairment. 20 C.F.R. §416.912.   Ms. Harris was represented by counsel before the ALJ, and the ALJ was therefore entitled to assume that she presented his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).

The ALJ's error with respect to weighing Dr. Karr's opinion requires remand. "An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).   ALJ Suffi's failure to provide a sound explanation requires remand. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2010), citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Harris is disabled or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Teresa J. Harris' application for

social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**       **August 25, 2016.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

22